UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61053-CIV-ALTMAN/Hunt

**CHERYL CENDAN**,

*Plaintiff*,

*v.*

**SCHOOL BOARD OF BROWARD
COUNTY, FLORIDA**,

*Defendant*.

_____/

**ORDER**

Cheryl Cendan worked for the School Board of Broward County—first as a teacher and most recently as Millennium Collegiate Academy's principal—for over twenty years. But, in 2018, a former colleague accused her of violating MCA's policies. With the whistle thus blown, a series of events played out quickly: the School Board told Cendan about the accusations and opened an investigation; Cendan sought counsel; the School Board temporarily reassigned her to a different job; Cendan requested (and received) leave under the Family and Medical Leave Act of 1993 ("FMLA"); Cendan *retired*; and the School Board (in receipt of Cendan's retirement letter) announced that Cendan wouldn't be returning as MCA's principal.

Unhappy with how things played out, Cendan sued the School Board, alleging a couple of due-process violations (Counts I and II), an act of FMLA retaliation (Count III), and negligent supervision (Count IV). After some protracted litigation, the parties filed their cross-motions for summary judgment, which we resolve here. As we'll explain in more detail below, we now conclude that no reasonable jury could find that Cendan was terminated, that she suffered an adverse employment action, or that she was the subject of any tortious conduct (much less tortious conduct the School Board knew about and failed to prevent). After careful review, in short, we **GRANT** the

School Board's Motion for Summary Judgment ("Def.'s MSJ") [ECF No. 96] and **DENY** Cendan's

Motion for Partial Summary Judgment ("Pl.'s MSJ") [ECF No. 108].[1]

## THE FACTS[2]

In 1991, our Plaintiff, Cheryl Cendan, began her career as a substitute teacher for the School

Board. *See* JSOF ¶ 1. On July 1, 2017, Cendan took over as principal of MCA under an annual contract

that expired on June 20, 2018. *Id.* ¶ 2. On April 18, 2018, a former MCA employee, Katherine

Mastrianni, sent an email to several School Board officials about "possible Title I irregularities" at

MCA. Mastrianni Email [ECF No. 98-1] at 1; *see also* JSOF ¶¶ 4–5.[3] In that email, Mastrianni advanced

several (very serious) allegations against Cendan, including that "Dr. Cendan's son, Reuben, (a non

teacher), has been tutoring for over a year on Saturdays using funds from the school," that "the

concession stands and other fundraising activities are primarily overseen by Dr. Cendan's mother,

---

[1] Both motions are fully briefed and ripe for adjudication. *See* Cendan's Response to the School Board's Motion for Summary Judgment ("Pl.'s Response") [ECF No. 117]; School Board's Reply in Support of its Motion for Summary Judgment ("Def.'s Reply") [ECF No. 118]; School Board's Response to Cendan's Motion for Partial Summary Judgment ("Def.'s Response") [ECF No. 104]; Cendan's Reply in Support of her Motion for Partial Summary Judgment ("Pl.'s Reply") [ECF No. 112].

[2] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering the School Board's MSJ, then, we describe the facts in the light most favorable to Cendan—drawing solely from the parties' Joint Statement of Material Facts ("JSOF") [ECF No. 125] and Cendan's Response Statement of Material Facts ("Pl.'s Response SOF") [ECF No. 116].

[3] The JSOF gives us two different dates for this email: In one place, it says that the email was sent "on April 18, 2018," JSOF ¶ 4; in the next paragraph, though, it claims that the email was sent "on or about April 12, 2018," *id.* ¶ 5. Fortunately, the email is in the record, and it's dated April 18, 2018. *See generally* Mastrianni Email. In any event, the exact date of the email isn't material to the questions before us.

Linda Lustig," and that "concession stand cash is collected during lunch only by Ms. Lustig and Dr. Cendan's former nanny, Ms. Claudine Lawrence." Mastrianni Email at 1–2; *see also* JSOF ¶ 6 (recounting Mastrianni's allegations about Cendan's son using school funds to tutor MCA students on Saturdays).

In the spring of 2018 (when the email was sent), Cendan's immediate supervisor was Christine Semisch, the Cadre Director for the Office of School Performance and Accountability ("OSPA"). *See* JSOF ¶ 8. As Cadre Director, Semisch was responsible for investigating disciplinary allegations against the School Board's principals and deciding whether to hold a pre-disciplinary meeting. *Id.* ¶ 9. On May 23, 2018, Semisch sent Cendan a Pre-Disciplinary Notice, *id.* ¶ 10, informing Cendan of Semisch's view that she had violated the School Board's policies by allowing her family members to work at MCA, *id.* ¶ 12; *see also* Pre-Disciplinary Notice [ECF No. 98-3] at 1–2. The Notice directed Cendan to report to Dr. Valerie Wanza's[4] office on June 5, 2018, to discuss Cendan's "failure to follow guidelines and procedures outlined in the following School Board Policies: Policy 4002.01 Nepotism/Employment and Assignment of Relatives . . . Policy 3.2 Food and Beverage Services Available to Students . . . Policy 6301 Collection of Monies and Standard Practice I-101 . . . Operating unauthorized non-School Board sanctioned Before & After and Summer programs." Pre-Disciplinary Notice at 1–2. The Notice also informed Cendan that she had "the right to have the representative of [her] choice present at this meeting." *Id.* at 2. At Cendan's request, the Pre-Disciplinary Meeting was rescheduled for May 29, 2018. *See* JSOF ¶ 14.

During this time (May 2018), Cendan was a member of the Broward Principals and Assistant Principals Association ("BPAPA")—whose executive director was Lisa Maxwell. *See id.* ¶ 13. After receiving the Pre-Disciplinary Notice, Cendan asked Maxwell to help her respond, *id.* ¶ 15, and

---

[4] Valerie Wanza—the Chief of OSPA—was Cendan's second-level supervisor, and she reported directly to the School Board's Superintendent. *See* JSOF ¶ 35.

Maxwell represented Cendan at the Pre-Disciplinary Meeting on May 29, 2018, *id.* ¶ 17. BPAPA also provided Cendan with an attorney, Christopher Whitelock, who likewise attended that meeting. *Id.* ¶ 16.

The Pre-Disciplinary Meeting lasted about 45 minutes, *id.* ¶ 19, and—with Whitelock and Maxwell present—Cendan told the OSPA that "she was in full compliance with applicable financial protocols, in accordance with a recent audit of [MCA's] financial records, including the donations from the [MCA] Booster Club," *ibid.* In response, Cadre Director Alan Strauss argued that these "Booster" donations hadn't been properly deposited into MCA's internal accounts. *Ibid.* The School Board took no disciplinary action at that meeting, *id.* ¶ 18—at the end of which Cendan agreed to send OSPA some additional documents, *id.* ¶ 20, including the Booster Club's bank records, financial statements, by-laws, meeting minutes, donation letters, and "Independent School related Organization Letter of Agreements," Cendan/Semisch Email Exchange [ECF No. 98-5] at 2. Over the next few days, Cendan and Semisch exchanged emails about these documents, and Cendan confirmed: "I will try to get these to you as quick as possible, even if piecemealed [sic]." *Ibid.*

On May 29 or 30, 2018, Cendan traveled to Bradenton for her son's med-school graduation. *See* JSOF ¶¶ 21, 24. While there, Cendan spoke with both Maxwell and Whitelock about the disciplinary issues the School Board had raised in the Notice and at the meeting. *Id.* ¶ 22. On June 1, 2018, Cendan applied for FMLA leave, *id.* ¶ 33—a request the School Board promptly approved for the period May 29, 2018, through August 22, 2018, *id.* ¶ 34. On June 3, 2018, Cendan emailed an OSPA secretary, asking that she "please take out my vacation days for the week of June 11 and June 18" because "I will be severing my employment with the District, and I need that reflected back in the vacation day balance." *Id.* ¶¶ 25–26. Flag this email because it will become very important to our overall story. The following day (June 4), Semisch sent Cendan an email, inviting her to a second

meeting at OSPA on June 5. *See* June 4 Email Exchange [ECF No. 98-8] at 5.[5] Later that same day, Cendan answered Semisch with an email of her own, explaining: "I scheduled an appointment on Thursday [June 7] with the retirement specialist to submit my paperwork. I will not be returning on campus, I can turn in my keys, laptop, phone etc. to SIU Thursday after the retirement appointment, if that is agreeable." *Ibid.* Keep an eye on this email, too, because it likewise will play an outsized role in our case.

The following day (June 5), Wanza—who had been copied on the June 4 Email Exchange—responded to Cendan's latest missive with several important points. *One*, Wanza wrote: "[A]ttached is a document that Mrs. Semisch was going to provide to you today, June 5, 2018." *Id.* at 3. The attached document was a "Memorandum of Temporary Reassignment" dated June 4, 2018. *See* Memorandum of Temporary Reassignment [ECF No. 98-9] at 1; *see also* JSOF ¶ 29. This memo, addressed to Cendan, provided that, "effective immediately, you are hereby reassigned to the Office of School Performance & Accountability pending the final outcome of a pre-disciplinary meeting held with you and your representation on May 29, 2018. . . . Your working hours will be 8:00 a.m. to 4:00 p.m." Memorandum of Temporary Reassignment at 1. *Two*, Wanza banned Cendan from returning to MCA, saying: "[W]hile you indicated that you do not have any intention on returning to the Millennium Campus, you are hereby informed by me that you are not to return to the campus unless you are accompanied by Mrs. Semisch or me." June 4 Email Exchange at 3. *Three*, Wanza said that, "after your meeting with Benefits on Thursday, June 7, 2018, you are to report to the Office of School Performance & Accountability to return all of your district-issued equipment to Mrs. Semisch and me." *Ibid.* That night (still June 5, 2018), Cendan confirmed that she would "report to the Area office, as requested,

---

[5] Although the parties haven't cited these portions of this June 4 Email Exchange in their briefing, the Federal Rules allow us to rely on record evidence the parties *didn't* reference. *See* FED R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

as soon as that [Benefits] meeting concludes" on June 7. *Id.* at 2. Cendan added: "Additionally, as requested, I will bring all of my equipment, keys, and the effective date of retirement." *Ibid.* On June 6, Cendan wrote to Wanza again, saying: "I will attend the retirement meeting tomorrow, but my doctor has placed me under his care. I can meet at the SIU building and submit my materials there." *Id.* at 1.

On June 7, Cendan (as planned) signed her "Separation of Employment (Resignation) and Retirement Form," which provided that "the primary reason for your *voluntary* separation" was "retirement." Retirement Form [ECF No. 98-10] (emphasis added) at 1; *see also* JSOF ¶ 37. Across the top of the Retirement Form—which Cendan signed and dated—we can still see the following instruction: "Complete if resigning or retiring from Broward County Public Schools. This action terminates the employee from the district." Retirement Form at 1.

Now trying to explain her decision to retire, Cendan says that, while she was in Bradenton (June 1–4), she spoke several times to Maxwell who, according to Cendan, "was, in effect, the 'mouthpiece' for Wanza" and "the conduit for information from Wanza to Cendan." Pl.'s Response SOF ¶ 12. Cendan therefore contends that "her retirement was involuntary, since she suspected that the Non-Renewal Letter 'was in the offing.'" *Id.* ¶ 17; *see also* Cendan Dep. [ECF No. 98-14] at 151:10–14 ("Q: What did Ms. Maxwell say? A: Through email Maxwell told me to let her see the documents. And then we rolled into that weekend where it was all on the phone back and forth, resign, retire, resign, retire."); *see also id.* at 152:21–24 ("Because at that point it just was not adding up. I mean, come on like you said, I'm not – I don't think I'm not intelligent. And that was rubbing me wrong. Something was not right.").

In any event, later on June 7, Wanza held a meeting of MCA staffers. *See* JSOF ¶ 38. The public wasn't present at this meeting. *Id.* ¶ 39. Although Wanza asked that the meeting not be recorded, someone taped (and transcribed) her statements. *Ibid.* At the meeting, Wanza told MCA staff about

Cendan's situation: "[W]hat I will tell you," she said, "is Dr. Cendan has been reassigned from this school and she will never return as the principal of Millennium 6–12 Collegiate Academy[.]" Wanza Meeting Transcript [ECF No. 98-11] at 4:10–13. "[M]y office," she continued, "primarily me and the team that you see with me, we have launched an extensive probe into many practices in this school, I'm going to tell you straight up, that are violations not only of district policy, but state and federal laws." *Id.* at 4:14–19.

The next day (June 8)—one day after Cendan signed her Retirement Form—Wanza sent Cendan formal written notice that she wouldn't be reappointed as principal of MCA for the 2018–19 school year. *See* JSOF ¶ 40; *see also* Non-Renewal Letter [ECF No. 98-12] at 1 ("I must inform you that you will not be reappointed for the 2018-2019 Fiscal Year. Your last day of employment will be Thursday, June 28, 2018.").

Then came the aftermath: On June 13, Wanza referred OSPA's investigation to the School Board's Special Investigative Unit ("SIU") for a possible criminal inquiry. *See* JSOF ¶ 41. The SIU opened an investigation a week later, *id.* ¶ 43, and assigned SIU Detective Brian Pillado to lead it, *id.* ¶ 47. During its investigation, the SIU asked the Broward State Attorney's Office ("SAO") to subpoena and then examine "relevant financial records." *Id.* ¶ 44. The School Board also told the Florida Department of Education ("FDOE") about Mastrianni's allegations. *Id.* ¶ 42. On March 24, 2020 (nearly two years later), the FDOE declined to take administrative action against Cendan. *Id.* ¶¶ 49–50. The School Board's internal auditor, Joris Jabouin, certified in October 2018 that his audit of MCA's books revealed no "exceptions."[6] *Id.* ¶ 52.

Just a few weeks after she retired from MCA, Cendan was hired to teach at a public charter

---

[6] When Jabouin was asked, during his deposition, to define the word "exception," he said: "I don't have the precise definition of an exception, but if there is any sort of issue with respect to policy or procedure, or areas that require a communication, it would need to be pointed out." Jabouin Dep. [ECF No. 110-1] at 12:3–6.

school in Manatee County. *See id.* ¶ 53; *see also* Cendan Dep. at 15:7–9 ("Q: And when did you start working for Charter Schools USA as a curriculum resource teacher? A: July of 2018."). In July of 2020, she became a curriculum specialist for the Manatee County School District. *See* JSOF ¶ 54. On May 29, 2020, she filed this lawsuit, which she's amended three times. *See* Am. Compl. [ECF No. 9]; Second Am. Compl. [ECF No. 24]; Third Am. Compl. [ECF No. 48]. In the now-operative Third Amended Complaint ("TAC"), she asserts four claims against the School Board: (1) Violation of 42 U.S.C. § 1983 under a "Stigma or Disability" Theory (Count I), *see* TAC ¶¶ 45–49; (2) Violation of 42 U.S.C. § 1983 under a "Reputation Plus" Theory (Count II), *see id.* ¶¶ 50–54; (3) FMLA Retaliation (Count III), *see id.* ¶¶ 55–67; and (4) Negligent Supervision (Count IV), *see id.* ¶¶ 68–82.

**THE LAW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the records, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for the trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (cleaned up); *see also* FED. R. CIV. P. 56(e).

When ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). "[A]ssessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment." *Obremski v. Armor Corr. Health Servs., Inc.*, 467 F. Supp. 3d 1265, 1275 (S.D. Fla. Apr. 7, 2020) (Altman, J.) (citing *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012)).

"[I]f there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial." *Torres v. Wal-Mart Stores E., LP*, 555 F. Supp. 3d 1276, 1282 (S.D. Fla. Aug. 17, 2021) (Altman, J.). The Court, on the other hand, must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of [its] case." *Celotex*, 477 U.S. at 323; *see also Lima*

*v. Fla. Dep't of Child. & Fams.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could

return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and

summary judgment will be granted." (cleaned up)).

**ANALYSIS**

## I.     Counts I & II: Cendan's § 1983 Claims

In Counts I and II, Cendan alleges that the School Board violated her due-process rights—

specifically, her liberty interest in continued public employment. The only difference between the two

counts is the theory Cendan says applies to each. In Count I, it's a "stigma or disability" theory, *see*

TAC ¶¶ 45–49, whereas in Count II it's a "reputation plus" theory, *id.* ¶¶ 50–54. In her briefing,

Cendan distinguishes the claims this way:

> To state a claim under the "stigma plus" or the "disability theory," under 42 U.S.C.
> Section 1983, based upon statements by officials in the public sector, a plaintiff must
> first allege a common law defamation claim; and then allege a constitutional injury,
> flowing from the defamatory statement. *See, Rehberg v. Paulik*, 611 F.3d 828, 852–852
> (11th Cir. 2010). Similarly, damages to a Plaintiff's reputation, pursuant to a
> "reputation plus" theory, are recoverable, under Section 1983, if the damages occurred
> as a result of government action, which significantly alters a plaintiff's constitutionally
> protected rights. *See, Jones v. Bruckner*, 963 F. Supp. 2d 1267 (N.D. Ala. 2013).

Pl.'s Response at 5 (errors in original). But we've read those cases, and they don't support Cendan's

view that these are two *different* § 1983 claims. In *Rehberg*, the Eleventh Circuit analyzed a § 1983 due-

process claim under the "stigma-plus" test. *See Rehberg*, 611 F.3d at 852 (citing *Cannon v. City of West*

*Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001)). In describing the test, the court said: "The 'stigma-

plus' test requires not only allegations stating a common-law defamation claim, but also an additional

constitutional injury, tied to a previously recognized constitutional property or liberty interest, flowing

from the defamation." *Ibid.* (citing *Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1438 (11th Cir. 1998)). So

far, so good.

Cendan gets into trouble, though, when she cites *Jones*—a decision from the Southern District

of Alabama—for the proposition that the law recognizes a separate test, in addition to *Rehberg*'s

"stigma-plus" test, which she calls the "reputation-plus" test. *See* Pl.'s Response at 5. But *Jones* doesn't support Cendan's "reputation-plus" theory at all.[7] Instead, *Jones* is just another "stigma-plus" case. Indeed, *Jones* specifically cites *Rehberg* as follows: "This doctrine is known as the 'stigma-plus' test, and requires Plaintiff to show both a valid defamation claim (the stigma) *and* 'the violation of some more tangible interest' (the plus)." *Jones*, 963 F. Supp. 2d at 1286 (citing *Rehberg*, 611 F.3d at 852). *Jones*, in fact, refers to the "stigma-plus" test four separate times and never so much as mentions any so-called "reputation-plus" theory. *See generally ibid.* Since Cendan has identified no law for her "reputation-plus" cause of action—and because we can find no support for it anywhere—we'll treat her two § 1983 counts as asserting one "stigma-plus" claim.

That "stigma-plus" claim has six elements. As the Eleventh Circuit has explained: "In order to establish that a deprivation of a public employee's liberty interest has occurred without due process of law, the employee must prove that (1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) was made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing." *Cannon*, 250 F.3d at 1301. Cendan has failed to adduce *any* evidence for the first, third, fourth, and sixth elements of this claim.

Starting with the *third* element, the record is clear that Cendan voluntarily retired from her job with the School Board. As a result, no reasonable jury could find that she was discharged (or that she suffered any other "significant alteration" of her legal status). Turning back to the *first* element, Cendan never alleges that anything in the one statement she challenges here—the Non-Renewal Letter—was false. With respect to the *fourth* element, the School Board never made the Non-Renewal Letter "public." And, as for the *sixth* element, Cendan cannot show that the School Board deprived her of a

---

[7] Of course, even if it did, we wouldn't have to follow it. "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (cleaned up) (quoting J. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 143.01[1][d] (3d ed. 2011)).

meaningful opportunity to clear her name. We address each of these elements in turn.

## A.  The Third Element: "Significant Alteration of Legal Status"

Cendan cannot show that she was terminated (or that she suffered some other "significant alteration" of her legal status).

"[D]efamation by the government, standing alone and apart from any other governmental action, does not constitute a deprivation of liberty or property under the Fourteenth Amendment." *Cannon*, 250 F.3d at 1302 (citing *Paul v. Davis*, 424 U.S. 693, 694 (1976)). Rather, "a plaintiff claiming a deprivation based on defamation by the government must establish the fact of the defamation 'plus' the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause." *Ibid.*; *see also Paul*, 424 U.S. at 709–10 ("[I]t was [the] alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards."). As our Circuit has explained: "We do not think the law of this Circuit has established that defamation occurring other than in the course of dismissal from a job or in the termination or significant alteration of some other legal right or status will suffice to constitute a deprivation sufficient to state a claim under section 1983." *Von Stein v. Brescher*, 904 F.2d 572, 582 (11th Cir. 1990).

As we've suggested, Cendan's "stigma-plus" claim fails because the School Board never terminated her and because she suffered no other "significant alteration of some [ ] legal right or status[.]" *Ibid.* To the contrary, the undisputed evidence reveals that Cendan *retired*. She admits, for instance, that, "[o]n Sunday, June 3, 2018, the Plaintiff contacted, by email, the School Board OSPA Office, through an Office Secretary, Ms. Vickers, in order to sever her employment relationship with the School Board." JSOF ¶ 26. Nor could she have said otherwise. The record, after all, includes the (very) crucial email, in which Cendan wrote: "Ms. Vickers, Please take out my vacation days for the weeks of June 11 and June 18. I will be severing my employment with the district and need that

reflected back in the vacation day balance." June 3 Email [ECF No. 98-7] at 2. Cendan also stipulates that, "[o]n June 7, 2018, Cendan executed a separation of employment and retirement form which stated that the reason for her voluntary separation from the School Board was retirement." JSOF ¶ 37. Again, she couldn't have argued otherwise because we have the "Separation of Employment (Resignation) and Retirement Form" she signed and dated on June 7, which states (unambiguously) that "the primary reason for your voluntary separation" is "retirement." Retirement Form at 1.

Against this conclusive evidence of her retirement, Cendan advances two arguments—both unavailing. *One*, she claims that she was "constructive[ly] discharged" because her "notice of intention to retire on June 3, 2018, was *compelled* and *involuntary*[.]" Pl.'s Response at 8, 1 (emphasis in original). *Two*, she points to "the issuance of the Non-Renewal Letter," which (she insists) was a "severe adverse action . . . a death knell to any employee in the education administration field." *Id.* at 6–7.

   *i.*  *Constructive Discharge*

Cendan was not constructively discharged.

"If circumstances establish that an employee was not terminated and instead resigned voluntarily, due process is not implicated." *Rademakers v. Scott*, 350 F. App'x 408, 411 (11th Cir. 2009). "If an employee resigns voluntarily, he was not deprived of a property (liberty) interest without due process. The court's inquiry must focus on voluntariness. Resignations are presumed voluntary unless (a) forced by coercion or distress or (b) obtained by deception or fraud." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995). "Resignations can be voluntary even where the only alternative is facing possible termination for cause or criminal charges." *Ibid.* "Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff *had a choice*. [Plaintiff] could stand pat and fight." *Ibid.* "[T]he assessment [of] whether real alternatives were offered is gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation . . . is

irrelevant." *Ibid.*

These aspects of *Hargray*'s holding are dispositive here. On June 3, 2018, Cendan emailed a School Board secretary the following unequivocal statement of her intentions: "I will be severing my employment with the District." June 3 Email at 1. Four days later, on June 7, she signed the Retirement Form, which stated that the "reason for [her] voluntary separation" was "retirement." Retirement Form at 1. Cendan's resignation is thus "presumed voluntary" unless she can produce some evidence that she was *either* coerced *or* deceived (or defrauded) into retiring. *Hargray*, 57 F.3d at 1568. Cendan doesn't even argue that she was in any way deceived or defrauded, *see generally* Pl.'s Response, so she's forfeited any such argument, *see United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited].[.]"). And, as we're about to see, she has absolutely no evidence that she was coerced—let alone that the School Board was behind that coercion.

Trying to establish coercion, Cendan claims that she didn't want to retire but was pressured into leaving by *her own representative* (Maxwell). *See* Pl.'s Response at 2–3, 9. Here's her version of it:

> Plaintiff's reasonable [belief] that she was going to be non-renewed by the Defendant, was the product of numerous telephone calls, with Lisa Maxwell, her representative as the Executive Director of the Broward Principals and Assistant Principals Association ("BPAPA[]")[.]

*Id.* at 9 (errors in original). Recognizing, however, that pressure from Maxwell—who doesn't work for the School Board—wouldn't save her § 1983 claim, Cendan adds this nugget: "[A]nd the record reflects that there were telephone calls between Plaintiff and Maxwell, from May 30, 2018 to June 1, 2018, following numerous telephone calls between Maxwell and School Board OSPA Chief Valerie Wanza." *Ibid.* As evidentiary support for these calls between Maxwell and Wanza, Cendan points to

one document: an AT&T phone log that appears to show several calls between Maxwell and Wanza—and between Maxwell and Cendan—in the final days of May and the beginning of June. *See* Phone Log [ECF No. 116-6]; *see also* Maxwell Dep. [ECF No. 19-15] at 40:1–10 (agreeing that she spoke several times over the phone with Cendan during this period); *id.* at 48–51 (acknowledging that she also spoke to Wanza over the phone during this time).

But this Phone Log doesn't tell us *what* Maxwell and Wanza were talking about during these calls. Cendan thinks she has an answer for this too. In her view:

> The inference from these multiple telephone calls from Maxwell to the Plaintiff, after Maxwell had spoken with Wanza, is the ultimate conclusion, buttressed by a strong inference, that Maxwell was the "mouthpiece" of the Defendant. The stacking of these inferences is reasonable, and the attending circumstances, taken as a whole, constitutes a question of fact for the jury.

Pl.'s Response at 9 (errors in original). This is frivolous.

Cendan is right to point out that, at summary judgment, we draw all reasonable inferences in favor of the non-movant. *See Pennington*, 261 F.3d at 1265. She's right, too, when she says that we *can* "stack inferences[.]" *Berbridge v. Sam's E., Inc.*, 728 F. App'x 929, 932 (11th Cir. 2018) (noting that "the district court appears to have erred in applying the state-law rule against stacking inferences" (cleaned up)). But "a reasonable inference" is one that "a reasonable and fair-minded [person] in exercise of impartial judgment might draw *from the evidence.*" *Ibid.* (emphasis added). In other words, "a jury cannot be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such an inference is infirm because it is not based on the evidence." *Ibid.* (cleaned up); *see also Harrell v. City of Opa-Locka*, 2022 WL 898565, at *20 (S.D. Fla. Mar. 28, 2022) (Altman, J.) ("[A]t summary judgment, a plaintiff must produce *evidence* to support her contention[s.]"). And, unfortunately for Cendan, what she calls a "strong inference" is really just rank speculation—premised, not on evidence, but on more speculation. To accept Cendan's chain of inferences, in fact, we'd have to make four assumptions—all without *any* evidence.

*One*, we'd have to assume, from the mere fact that these calls were made, that Wanza was interested in forcing Cendan to retire. But there's no evidence of this at all. On the contrary, the only evidence we have about the relationship between Cendan and Wanza is Cendan's own testimony that, at the end of the Pre-Disciplinary Meeting, "Dr. Wanza kissed me, hugged me, told me I must be a very proud Momma because my son is graduating medical school, 'go enjoy your graduation, have a wonderful graduation.'" Cendan Dep. at 82:16–19. Again, we don't draw inferences that aren't based on the evidence. *See, e.g.*, *Breaux v. NCL (Bahamas) Ltd.*, 2022 WL 2304254, at *8 (S.D. Fla. June 24, 2022 (Altman, J.) ("*No* evidence (it goes without saying) isn't enough to withstand summary judgment."); *see also Wills v. Walmart Assocs., Inc.*, 2022 WL 845183, at *7 n.6 (S.D. Fla. Mar. 22, 2022) (Altman, J.) ("[S]peculation isn't enough to survive summary judgment.").

*Two*, even if we accepted that Wanza wanted to coerce Cendan into retiring, we'd also have to assume that, in these calls, Wanza was trying to recruit Maxwell (Cendan's *own* representative) into her coercion scheme. Again, not only do we have no evidence of this, but the evidence we *do* have unambiguously establishes that Wanza did no such thing. When Maxwell was asked: "[D]id Valerie Wanza communicate with you during that period of time, May 29, 2018, after the meeting up until the time Cheryl Cendan severed her employment relationship with the school board that she wanted you to communicate to Cheryl Cendan that Cendan should resign or retire her employment with the school board?" she testified: "Dr. Wanza never said that to me, no." Maxwell Dep. at 43:5–15. Cendan never rebuts this testimony.

*Three*, even if we accepted that Wanza wanted to coerce Cendan into retiring—and that she'd decided to enlist Maxwell in that conspiracy—we'd still have to assume that Maxwell (Cendan's *own* representative) *agreed* to participate in that conspiracy. Again, Maxwell—who, let's not forget, runs an association dedicated to supporting the interests of school principals (like Cendan)—put this issue to bed. In her words:

> I never instructed Dr. Cendan to resign, retire. As a matter of practice over the many years that I have been doing this in conjunction with Mr. Whitelock, is we view our role as laying out all of the potential options and all of the potential pitfalls based on our experience that can happen to someone who's in a situation, a disciplinary situation, and then we make it very clear that it's up to the individual to make the decisions necessary based upon your own individual situations.

*Id.* at 41:7–17. Unsurprisingly, Cendan has no evidence to the contrary.

*Four*, even if we accepted that Wanza wanted to coerce Cendan into retiring, and even if we agreed that Wanza decided (in these calls) to recruit Maxwell into her coercion conspiracy, and even if we grant that Maxwell agreed to work *against* Cendan's interests, we'd still have to assume that Maxwell *actually* coerced Cendan into retiring. At the very least, this coercion would've had to include some series of communications, from Maxwell to Cendan, in which Maxwell made her pitch. But, again, Maxwell denied that she ever said any such thing to Cendan. When asked: "[D]id you ever have a communication with Cheryl Cendan wherein you instructed her to resign or retire from her employment with the school board?" Maxwell replied: "No. No. I never instructed her to resign." *Id.* at 42:9–17. And, as we might expect, Cendan has *no* evidence that Maxwell *did* coerce her. The closest she gets is her statement that "[t]hrough email Maxwell told me to let her see the documents. And then we rolled into that weekend where it was all on the phone back and forth, resign, retire, resign, retire." Cendan Dep. at 151:10–14. Even here, though, she never says she was *coerced*. She, to the contrary, makes clear that "at that point it just was not adding up. I mean, come on like you said, I'm not – I don't think I'm not intelligent. And that was rubbing me wrong. Something was not right." *Id.* at 152:21–24. Cendan, in other words, testified that she was smart and that she knew exactly what was going on—but she never said she felt coerced.

Recall that a "reasonable inference" is one that a juror "might draw from the evidence." *Berbridge*, 728 F. App'x at 932. But *no* evidence isn't enough to support an inference—let alone to survive summary judgment. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary

judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (cleaned up)); *see also Breaux*, 2022 WL 2304254, at *8 ("*No* evidence (it goes without saying) isn't enough to withstand summary judgment."); *Wills*, 2022 WL 845183, at *7 n.6 ("[S]peculation isn't enough to survive summary judgment.").

It wouldn't be fair to stop here, though, because, while it's true that Cendan has no evidence of coercion, the School Board has plenty of evidence that Cendan's retirement was voluntary. As we've said: "Resignations can be voluntary even where the only alternative is facing possible termination for cause or criminal charges. Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff *had a choice*. [Plaintiff] could stand pat and fight." *Hargray*, 57 F.3d at 1568. "[T]he assessment [of] whether real alternatives were offered is gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation . . . is irrelevant." *Ibid.*

And the record in our case is clear that, "even if . . . a School Board employee had given Cendan the option to resign or face termination, Cendan had real alternatives." Def.'s MSJ at 9. At her deposition, after all, Cendan was asked: "When did you decide that you were going to sever your employment relationship with the Broward School District?" She answered: "When I was forced over the weekend to have three bad options: resign, retire, or being non-renewed. So out of being forced to choose between three bad options I had to get financial advice to see which one would be the best suited, that I could recover my money, because like I told you previously I was the financial breadwinner for my household." Cendan Dep. at 121:5–15. Again: "Resignations can be voluntary even where the only alternative is facing possible termination for cause or criminal charges. Resignations obtained in cases where an employee is faced with such unpleasant alternatives are

nevertheless voluntary because the fact remains that plaintiff *had a choice*. [Plaintiff] could stand pat and fight." *Hargray*, 57 F.3d at 1568 (emphasis in original).

On this issue, the Eleventh Circuit's decision in *Rademakers* is instructive. The plaintiff there knew that her employer was investigating her, and she was informed of "the specific allegations of misconduct." 350 F. App'x at 413. "Rademakers stated that, after she 'heard rumors' she was going to be fired, she contacted her attorney and a union official. . . . According to Rademakers, [her boss] told [her union rep] that Rademakers's termination 'was a done deal,' and that Rademakers could resign that day or be fired the next morning. Based on her choices, Rademakers decided to resign." *Id.* at 410. Like Cendan, in other words, Rademakers decided to resign "with the assistance of counsel and a union representative." *Id.* at 412. Relying on *Hargray*, the Eleventh Circuit affirmed the district court's conclusion that Rademakers's resignation was voluntary. As the court explained: "Because Rademakers resigned of her own free will, even though prompted to do so by events set in motion by her employer, she relinquished her liberty interest voluntarily and thus cannot establish that [her employer] deprived her of it within the meaning of the due process clause." *Ibid.*

So too here. Cendan—who was under investigation, who understood the nature of the allegations against her, and who was at all times represented by Maxwell and Whitelock—*admitted* that she was faced with three options: retire, resign, or be terminated. She chose the first. Like Rademakers, this choice—unpleasant thought it may have been—was voluntary.[8]

Because Cendan retired voluntarily, she wasn't deprived of a liberty interest. *See Hargray*, 57 F.3d at 1568 ("If an employee resigns voluntarily, he was not deprived of a property (liberty) interest without due process."); *see also Rademakers*, 350 F. App'x at 411 ("If circumstances establish that an

---

[8] Cendan says that "the Non-Renewal Letter pulled the rug out from under the Plaintiff and removed any possibility of standing and fighting to preserve her position." Pl.'s Response at 7 n.18 (cleaned up). But this was also true of Rademakers who was *explicitly* told—before she retired—that she had only two choices: "resign that day or be fired the next morning." *Rademakers*, 350 F. App'x at 410.

employee was not terminated and instead resigned voluntarily, due process is not implicated.").

      *ii.*        *The Non-Renewal Letter*

Cendan also relies on the Non-Renewal Letter, which she casts as a "destructive adverse employment action" and "a death knell to any employee in the education administration field." Pl.'s Response at 6. But, again, Wanza only sent this letter *after* Cendan announced her retirement. *See* JSOF ¶ 40. Resisting this chronology, Cendan argues that her retirement wasn't yet *effective* when the School Board sent her the Non-Renewal Letter because her resignation hadn't been approved by a vote of the Board. *See* Pl.'s Response at 6 ("[A]lthough Cendan does not dispute, that she informed the School Board of her intention to sever her employment relationship with the Defendant on June 3, 2018; that intention would not become finalized, at the very minimum, until the next meeting of the Broward County School Board on June 26, 2018."); *see also* Pl.'s Response SOF ¶ 15 ("Cendan does not dispute that she informed the School Board of her intention to sever the employment relationship; that intention would not become finalized, until the next meeting of the Broward County School Board, on June 26, 2018."). And Wanza did agree that "Dr. Cendan's intention to retire eventually had to be approved by the board[.]" Wanza Dep. [ECF No. 110-4] at 66:14–18.

But there's no evidence that this ratification vote would have been anything but *pro forma* or that, until the vote, Cendan's retirement was essentially a meaningless nullity. The Non-Renewal Letter, in short, wasn't some cataclysmic break in the chain of events between Cendan's announced retirement and her effective resignation. It, instead, simply memorialized Cendan's separation from the school, gave her information about benefits, and directed her to some professional-resource guides. It's thus hard to see how this letter constituted *either* a termination *or* a "significant alteration of some other legal right or status[.]" *Von Stein*, 904 F.2d at 582. Even if it did, though, Counts I and II would still fail because, as we're about to see, Cendan hasn't even tried to meet *three* other elements of her claim.

**B.  The First Element: Falsity**

Cendan's "stigma-plus" claim relies on one "stigmatizing" statement—the Non-Renewal Letter—which (Cendan says) "was *earth shattering*, it would have tremendously impacted Plaintiff's future employment prospects[.]" Pl.'s Response at 6; *see also* Pl.'s Response SOF ¶ 23 ("This June 8, 2018, 'letter,' was momentous because the Non-Renewal Letter, would have placed a black mark on Cendan's professional record; resulting in the impossibility of obtaining another administrative position in the education field."). But, to satisfy the "stigma-plus" test, Cendan must show, first and foremost, that the statement was false. *Cannon*, 250 F.3d at 1301. And the problem is she never suggests that anything in the Non-Renewal Letter was in the least bit untrue. *See generally* Pl.'s Response. She's thus forfeited any such argument. *See Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited].").

Nor could she have said that anything in the letter was false. The Non-Renewal Letter, in its entirety, reads as follows:

Dear Dr. Cendan:

Reappointments for continued employment are done annually prior to June 30th of each year. I must inform you that you will not be reappointed for the 2018-2019 Fiscal Year. Your last day of employment will be Thursday, June 28, 2018.

Your benefits will remain in effect through Saturday, June 30, 2018. COBRA information will be sent to your home address after your employment ends. Please verify that your address is correct in Employee Self Service (ESS). If you have questions prior to receiving COBRA information, you may contact the Benefits & Employment Services Department at 754-321-3100.

For questions about possible retirement options and/or if you are currently enrolled in DROP, please contact the Retirement Section of the Benefits & Employment Services Department at 754-321-3100 to prevent your DROP from being voided.

The Human Resources & Equity Division is coordinating information sessions and professional enhancement activities to assist employees not reappointed for the 2018-

2019 Fiscal Year. Employment resource flyers outlining the scheduled dates, times, and locations will be made available at www.employment-resource-blogspace.com.

Sincerely,
Valerie S. Wanza, Ph.D.
Chief School Performance and Accountability Officer

There's nothing remotely false here. In the letter, Wanza told Cendan that she wouldn't be renewed for the upcoming school year; gave her information about benefits; and directed her to some professional resources. Because none of that was false, Cendan's "stigma-plus" claim fails *even if* the School Board *did* fire her.

### C. The Fourth Element: "Made Public"

Cendan's "stigma-plus" claim also fails because she cannot show that the School Board "made public" any "false" statement about her.

To constitute the "deprivation of a liberty interest, the stigmatizing information must be both false . . . and made public . . . by the governmental entity." *Thomason v. McDaniel*, 793 F.2d 1247, 1250 (11th Cir. 1986) (cleaned up) (affirming the district court's holding "that Thomason did not satisfy the requirement of publication because he had failed to establish that any disclosure of the reasons for the discharge, that is, the substance of the complaints, was ever made to the general public"); *Bishop v. Wood*, 426 U.S. 341, 348 (1976) ("Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired."). And it's well-settled that "[t]he publication prong is not met as a matter of law where communications are between governmental employees and agencies." *Washington v. Miami-Dade Cnty.*, 2019 WL 7049931, at *3 (S.D. Fla. Dec. 23, 2019) (Moreno, J.) (finding that "statements to 40 officers at a meeting" were not "public" because "the intragovernmental dissemination of information . . . does not meet the publication prong"); *Learned v. Bellevue*, 860 F.2d 928, 933 (9th Cir. 1988) ("Learned's supervisors did not 'publicly' stigmatize Learned; any defamatory remarks that may have been made did not go beyond others employed by the Department. . . .

Therefore, Learned's liberty claim must fail."); *Hogue v. Clinton*, 791 F.2d 1318, 1322 n.7 (8th Cir. 1986) ("Also, that the charges against Hogue were referred to the county Prosecuting Attorney does not constitute publication because the information was given to the prosecutor in his capacity as a public official.").

So far as we can tell from the record, the School Board sent the Non-Renewal Letter—the only stigmatizing statement Cendan complains about in her Response—to two (and only two) places: to Cendan and to the FDOE. *See* JSOF ¶ 40 ("On June 8, 2018, Wanza provided Cendan with a letter which provided formal notice that Cendan was not going to be reappointed as principal of MCA for the 2018-2019 school year."); *see also* Investigation Packet [ECF No. 109-1] at 16 (showing that the letter was included in the materials the School Board sent to the FDOE). But the former is neither public nor stigmatizing, *see Bishop*, 426 U.S. at 349 (holding that a statement wasn't "made public" because it was only shared with the plaintiff himself), and the latter is just a statement "between governmental employees and agencies." *Washington*, 2019 WL 7049931, at *3. In short, even if Cendan had been terminated—and even if the Non-Renewal Letter contained a false statement—her "stigma-plus" claim would fail because the Non-Renewal Letter was never "made public."

### D.  The Sixth Element: "Meaningful Opportunity for Employee Name Clearing"

Finally, Cendan's Counts I and II fail the sixth element of a "stigma-plus" claim because the School Board gave her a "meaningful opportunity" to clear her name. *Cannon*, 250 F.3d at 1301 (requiring a "stigma-plus" plaintiff to show that the government fired her "without a meaningful opportunity for employee name clearing").

Recall the events that preceded Cendan's retirement. Semisch—Cendan's direct supervisor—gave her notice of the allegations against her and invited her to participate in a meeting at Dr. Wanza's office on June 5, 2018. *See* JSOF ¶¶ 8, 10, 12. The Pre-Disciplinary Notice specifically laid out the School Board's charges—which included Cendan's (alleged) "failure to follow guidelines and

procedures outlined in the following School Board Policies: Policy 4002.01 Nepotism/Employment and Assignment of Relatives . . . Policy 3.2 Food and Beverage Services Available to Students . . . Policy 6301 Collection of Monies and Standard Practice I-101 . . . Operating unauthorized non-School Board sanctioned Before & After and Summer programs." Pre-Disciplinary Notice at 1–2. The Notice also informed Cendan that she had "the right to have the representative of [her] choice present at this meeting." *Id.* at 2. Cendan took Semisch up on this offer and asked Lisa Maxwell, BPAPA's executive director, to represent her. *See* JSOF ¶¶ 13, 15, 17. BPAPA also provided Cendan with an attorney, Christopher Whitelock, who likewise attended the meeting. *Id.* ¶ 16; *see also* Cendan Dep. at 77:9–11.

The meeting lasted about 45 minutes, *id.* ¶ 19, and—with Whitelock and Maxwell present— Cendan was given a chance to defend herself. She, for instance, told the OSPA Cadre Directors that "she was in full compliance with applicable financial protocols, in accordance with a recent audit of [MCA's] financial records, including the donations from the [MCA] Booster Club." *Ibid.* The School Board notably took no disciplinary action at that meeting. *Id.* ¶ 18. Instead, it opted to further investigate Cendan's defenses and even gave her the opportunity to send OSPA some additional documents. *Id.* ¶ 20. Over the next few days, Cendan and Semisch exchanged emails about the kinds of documents the School Board was demanding, including the Booster Club's bank statements, financial records, and donation letters. *Ibid.*; *see also* Cendan/Semisch Email Exchange at 2 (Semisch writing that, "per our discussion at this morning's pre-d meeting, please provide the following information as well as additional items listed below"); *ibid.* (Cendan responding: "I will try to get these to you as quick as possible, even if piecemealed"). There's no evidence that Cendan ever sent Semisch the documents the School Board had asked for. On the contrary, the evidence we *do* have suggests that Cendan *didn't* send them. *See* Cendan Dep. at 112:5–12 ("Q: Did – so your understanding from Ms. Maxwell was that she was going to – through the Broward Principal Assistants' Association prepare a response to the May 23 letter and provide the rest of the documents to OSPA as you said;

is that correct? A: Yes. Yes. Q: Did she do that? A: I've never seen it.").

Instead, on June 3, 2018, with these document requests still pending—and before the School Board could announce the results of its investigation—Cendan emailed an OSPA secretary, asking that she "please take out my vacation days for the week of June 11 and June 18," because "I will be severing my employment with the District, and I need that reflected back in the vacation day balance." JSOF ¶¶ 25–26. The following day (June 4), Semisch sent Cendan a email, inviting her to another meeting at OSPA on June 5. *See* June 4 Email Exchange at 5. Later that same day—and, again, before the School Board's investigation had been completed—Cendan answered Semisch with an email of her own, explaining: "I scheduled an appointment on Thursday [June 7] with the retirement specialist to submit my paperwork. I will not be returning on campus, I can turn in my keys, laptop, phone etc. to SIU Thursday after the retirement appointment, if that is agreeable." *Ibid.*

The School Board thus gave Cendan express notice of the charges against her, allowed her to appear with counsel *and* a separate representative of her choosing, and gave her three separate opportunities to defend herself—first at the May 29, 2018 hearing (which lasted some 45 minutes), then through a series of document requests, and finally at the June 5 meeting Cendan never attended. There's absolutely no evidence that any of these options was a sham, that the School Board had already made up its mind and was simply going through the motions, or that these were, for some other reason, anything but "meaningful opportunit[ies] for employee name clearing." *Cannon*, 250 F.3d at 1301. What the record is pellucid about is that, rather than take up these opportunities to clear her name, Cendan short-circuited the investigation by voluntarily (and unambiguously) resigning. For this third reason too, then, Cendan's "stigma-plus" claim fails.[9]

---

[9] Cendan, in passing, says that the Non-Renewal Letter "effectively quashed any possible administrative review" and "constituted a non-appealable administrative action." Pl.'s Response at 7 & n.17. But she cites no evidence for this proposition—and the letter itself says no such thing. *See generally* Non-Renewal Letter. In any event, she never explains why the various *earlier* opportunities she

***

We therefore **GRANT** the School Board's MSJ (and **DENY as moot** Cendan's MSJ) as to Counts I and II of Cendan's complaint.[10]

## II.    Count III: FMLA Retaliation

In Count III, Cendan alleges that "[t]here is a causal link between the taking of leave by the Plaintiff, on June 4, 2020, under the FMLA and Semisch's admission to the staff of the School Board's Special Investigative Unit ("SIU"), that Cendan was ultimately non-renewed, as a member of the non-instructional staff, and or she was terminated from her employment with the School Board, and or the decision to terminate and or separate her employment, was made, on June 8, 2018, and the Defendant immediately made the decision on non-renewal of her annual contract, on June 8, 2020, for taking leave, pursuant to the Family Medical Leave Act of 1991." TAC ¶ 66 (errors in original). As we've hinted, this claim likewise fails.

"[T]he FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and

---

was given to clear her name—all of which we've detailed here—were somehow insufficient to satisfy any due-process concerns.

[10] One last thing on the "stigma-plus" claim. Cendan cites "Fla. Stat. § 1012.7976 (1)(d)" for her view that "the submission, the complaint on Cendan, was not provided to the Florida Department of Education, Educational Practices Commission, within thirty days of the receipt of the filing of initial complaint by the School Board Employee, Katherine Mastriani [sic]." Pl.'s Response at 6. We assume that Cendan intended to cite FLA. STAT. § 1012.796(1)(d)(1), which provides that "each school district shall file in writing with the department all legally sufficient complaints within 30 days after the date on which subject matter of the complaint comes to the attention of the school district, regardless of whether the subject of the complaint is still an employee of the school district." In any case, she never explains which of the "stigma-plus" claim's six elements this fact satisfies, and we can't figure it out either. It's simply not our job to divine her intentions. *See Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments[.]"); *see also United States v. Caesar*, 2019 WL 6727504, at *7 (S.D. Fla. Dec. 11, 2019) (Altman, J.) ("[T]he Court is not obligated to divine the parties' arguments for them.").

retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act[.]" *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (cleaned up); *see also Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003) ("The two types of claims available to employees under the FMLA are interference and retaliation claims.").

Cendan, as we've said, has brought a claim of FMLA *retaliation*. Cendan says that "the Defendant's conduct was clearly and openly *retaliatory*, under the Family Medical Leave Act," Pl.'s Response at 12 (emphasis in original), and that "there can be no clearer direct statement of *retaliatory animus* from management," *id.* at 13. Cendan, in short, is asserting a *direct* claim of retaliation. A direct claim "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee," which, "if believed, . . . proves the existence of a fact without inference or presumption." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017) (cleaned up).[11]

---

[11]     Had Cendan wanted to assert a circumstantial claim of retaliation, she could've proceeded under the (somewhat more lenient) *McDonnell Douglas* framework. *See Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021) ("[W]e analyze FMLA retaliation claims based on *circumstantial* evidence under the *McDonnell Douglas* framework[.]" (emphasis added)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "*McDonnell Douglas* established a three-step process for analyzing [retaliation] claims." *Ehrhardt v. Haddad Rest. Grp., Inc.*, 443 F. App'x 452, 455 (11th Cir. 2011). *First*, "the plaintiff must . . . offer evidence sufficient to establish a *prima facie* case of discrimination and/or retaliation." *Vira v. Crowley Liner Servs., Inc.*, 723 F. App'x 888, 892 (11th Cir. 2018). *Second*, "[o]nce a prima facie case is made, the burden shifts to the defendant to articulate a legitimate, [non-retaliatory] reason for the adverse employment action." *Ibid. Third*, "[i]f the employer meets its burden, the plaintiff must then show that the employer's stated reason is pretext for discrimination and/or retaliation." *Ibid.* Cendan never cites *McDonnell Douglas* (or its progeny), never proceeds under its three-step framework, and never suggests that she's adduced any circumstantial evidence of retaliation. *See generally* Pl.'s Response. She's thus forfeited any such claim.
        We add here only that Cendan's circumstantial claim (had she advanced one) would've faltered at every step of the *McDonnell Douglas* test. *First*, she cannot make out a prima facie case because she voluntarily retired. She's thus suffered no materially adverse employment action. *Second*, the School Board has offered two legitimate, non-retaliatory reasons for non-renewing her—*viz.*, to memorialize her separation from MCA and because she was under investigation on charges of serious malfeasance. These are (we think) more than sufficient to meet its burden of production at step two. *See, e.g., Roper*

To survive summary judgment, an FMLA plaintiff must show that: "(1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1275 (11th Cir. 2020). "The adverse employment action must be material, meaning it must be one that 'could well dissuade a reasonable worker' from engaging in protected activity." *Wood v. Gilman Bldg. Prod. Inc*, 769 F. App'x 796, 802 (11th Cir. 2019) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

The parties disagree about whether Cendan engaged in a protected activity. "An employee engages in protected activity under the FMLA, if he requests time off, or otherwise provides notice to his employer of his need to take time off, for a 'serious health condition.'" *Ibid.* (quoting *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1384 (11th Cir. 2005)). The School Board insists there's "[n]o evidence . . . that at the time Cendan sought FMLA leave she was suffering from a serious medical condition." Def.'s MSJ at 15. In response, Cendan points to her FMLA Application [ECF No. 108-3], which includes a doctor's note, certifying that she needed "continued medical therapy monthly" for an unidentified condition that rendered her "unable to perform her duties[.]" *Id.* at 3. It's a close call, but we needn't decide today whether Cendan has created a genuine dispute of material fact on this first element of her claim because she's indisputably failed the other two.

---

*v. Foley*, 177 F. App'x 40, 46 (11th C. 2006) (finding a legitimate non-discriminatory reason where the plaintiff "had an extensive disciplinary record"); *Thomas v. Aventis Pharm., Inc.*, 177 F. App'x 54, 57 (11th 2006) (finding a legitimate non-discriminatory reason where the plaintiff "refused to meet with supervisors—a 'work rule' violation"); *Matamoros v. Broward Sheriff's Off.*, 2019 WL 3752776, at *6 (S.D. Fla. Aug. 8, 2019) (Smith, J.) (finding a legitimate non-discriminatory reason where the plaintiff had "already been the subject of four Internal Affairs investigations"); *Gloetzner v. Lynch*, 225 F. Supp. 3d 1329, 1357 (N.D. Fla. 2016) (Conway J.) (finding a legitimate non-discriminatory reason where, among other things, the plaintiff "was under an Internal Affairs investigation"). *Third*, Cendan never even *tries* to show that these are somehow *not* legitimate reasons for her non-renewal. She's thus failed to "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Diaz v. Transatlantic Bank*, 367 F. App'x 93, 96–97 (11th Cir. 2010); *see also Chandler v. Ga. Dep't of Behav. Health & Dev. Disabilities*, 861 F. App'x 296, 300 (11th Cir. 2021) ("When an employer articulates more than one legitimate, non-retaliatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." (cleaned up)).

### A.  Materially Adverse Employment Action

Cendan hasn't shown that the Non-Renewal Letter "had a materially adverse effect" on her. *Foshee v. Ascension Health-IS, Inc.*, 384 F. App'x 890, 891 (11th Cir. 2010) (noting that, at the very least, an FMLA-retaliation plaintiff must show that the employer's actions "had a materially adverse effect on her" (citing *Crawford v. Carroll*, 529 F.3d 961, 973–74 (11th Cir. 2008)). As we've seen, Cendan *retired* from her job as MCA's principal. *See generally* June 4 Email Exchange; *see also* Retirement Form. And we've already disposed of her baseless claim that Wanza—acting through Cendan's representative (Maxwell)—somehow coerced Cendan into resigning. *See supra* pp. 14–19. The *subsequent* Non-Renewal Letter—which Cendan harps on in her Response, *see* Pl.'s Response at 6–7—thus did little more than confirm the separation Cendan had already effectuated.

At one point in her Response, though, Cendan seems to say something a bit different: She suggests that, whether or not she retired, the School Board's decision to send her a Non-Renewal Letter was a "a death knell to any employee in the education administration field." *Ibid.* Cendan never tells us exactly what she means by this—which is probably reason enough to stop here. But she *might* be blaming her failure to secure an administrator's job for two years after she left MCA on the Non-Renewal Letter. *Cf.* JSOF ¶ 54 ("In 2020, Cendan secured employment as a curriculum specialist with the School Board of Manatee County."). If that's what she means—and, again, she never says so directly—her own affidavit belies this claim. She, after all, admitted that "the investigation of the Florida Department of Education, Florida Educational Practices Commission, continued for a period of almost two years," and that, "during this period, *because of the open administrative investigation*, I was unable to secure a position as an Administrator in the education field." Cendan Aff. [ECF No. 111-4] ¶ 3 (emphasis added). The only evidence we have on this question, in other words, suggests that the two-year gap between her principal position at MCA and her administrative role in Manatee County

was caused by the FDOE's investigation—*not* the Non-Renewal Letter. Cendan has thus failed to show that she suffered any materially adverse employment action.

### B. Causation

Cendan has also failed to show causation. It's true that Cendan asked for FMLA leave on June 1, 2018, *see* FMLA Application, and that she received the Non-Renewal Letter (the claimed adverse employment action) just seven days later, on June 8, 2018, *see* Non-Renewal Letter. It's true, too, that "[c]lose temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Jones*, 854 F.3d at 1271 (cleaned up). But the Eleventh Circuit has been clear "that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). And there's no dispute that the central event that ultimately resulted in the Non-Renewal Letter—Cendan's alleged violation of school policy—had already occurred *before* she asked for leave. *Compare* FMLA Application (June 1, 2018), *with* Mastrianni Email (Apr. 18, 2018), and Pre-Disciplinary Notice (May 23, 2018); *see also Wills*, 2022 WL 845138, at *18 (finding no causation in an FMLA-retaliation case because "the events that ultimately resulted in Wills's termination had already occurred *before* he took leave a second time"). Cendan has thus failed to establish causation.

The truth is that Cendan stakes her entire claim to a statement Semisch gave to the SIU—in which Semisch made a passing reference to Cendan's request for FMLA leave. *See* Pl.'s Response at 12–13; *see also* Semisch Statement to SIU. In that statement, Semisch said: "With her not coming in, trying to ascertain the information from Mr. Berkowitz, *getting a family medical leave,* and similar to Mr. Berkowitz, *a decision was made by Dr. Wanza to non-reappoint Dr. Cendan* as of the end of the month of June." Semisch Statement to SIU at 5 (emphasis added). By severing this part of the statement from

its context—and misreading it—Cendan concludes: "[T]here can be no clearer direct statement of retaliatory animus from management." Pl.'s Response at 13.

But this statement doesn't mean what Cendan thinks it means. In fact, this selection Cendan has conveniently cherry-picked is just Semisch's shorthand summary of a much longer story she had told over the course of the previous two pages. And, unfortunately, to understand what Semisch was getting at in this summation, we must recreate the whole story. Here goes:

> [Semisch:] I got back to the office [on June 7, 2018] because [Cendan's] plan was that after she went to the Benefits office to discuss retirement plans, she noted that she should be able—that she would be coming here to drop off those items. When I arrived back at the office waiting for her arrival, Dr. Wanza's secretary, Miss Collette Azael, said that she wanted to show me a family medical leave form that was sent in from the Benefit—from the Leaves department stating that Dr. Cendan would be going out on a family medical leave based on illness from June 1st to August 1st. *So it was obvious to us that she was not making any plans to come in to drop off her items, which obviously gave me some concern.*
>
> And then I recollect the—the conversation that happened with Mr. Berkowitz with the technology. So I decided to call Mr. Berkowitz and I said, "Did—did I hear you correctly that you have Dr. Cendan's technology?" And he said, "Yes, that's what I told you." And I said, "Well, I had a lot going on. You know, I just wanted to make sure." I said, "You know, she was supposed to bring it to the office. Not that you were aware of that but—so I'm—I would like to know what's in the bag. I can't obviously drive back over there at this moment," and asked him to inventory the bag that he said he had picked up from Dr. Cendan's house on Thursday morning, June 7th.
>
> Q. Oh, he got it from her house?
>
> A. He got it from her house, according to him. She—she was out—he asked her to come by the house, is what he told me. He said he was getting a quick bite to eat 'cause it was around noon or so. And I asked him, you know, "Finish up your lunch but, you know, I do want to see what that is." And he also mentioned there was a letter. So I said, "If you could scan that letter to me I would appreciate it, as well." I waited a little over an hour. I think it was close to an hour and 15 minutes based on my phone records and text messages. And, um, when I did not get the e-mail of the inventoried items in the bag or the scanned letter, I called him back and I said, "Mr. Berkowitz, I'm still trying to be patient and wait for you to return, you know—send me the e-mail."
>
> And I did let him know that I needed it immediately. So, um, he started to say it over the phone. I—"Well, there's a laptops—there's two laptops and there's an iPad and there's a phone and there's keys." I said, "Again, I—what I asked you to do is just to send me—as per your request, send me the inventory." And I said, "I need to understand what this letter is." I waited another 20 minutes or so, still no e-mail. I called him back. It went to his voice mail. I sent him a text saying, "Please call me." No response. I then called the office manager, Miss Alice Montanez, asked her to have Mr. Berkowitz come up to the front office and speak to me. And she noted that he

did—he was not going to be able to do that because he just left the building 'cause he wasn't feeling well. Um, I told her if she could please call him for me and let him—and—and give him a message to please call me. He has never called me back. So I what I had—I did tell him when I had the one conversation before he chose not to call me back or return my calls or text messages, I asked him to please put that—the bag and the letter in her office once he inventoried it. So I did go back not that same day but that week and I was able to inventory it myself, which again, was two laptops, an iPad, her keys, her—her phone, District phone. The letter was actually the letter from Amy Petros which was that Millennium letter. Because what happened was the—the checks, the two cashier checks were delivered by Kyle Spencer, the student worker, to our office. But we didn't obviously have any notation as to how they were to be used. And so that's why we said, you know, based on the recommendations from the Business Support Center, we need to understand how to use the—the—this type of money. And then that's when Amy Petros wrote the letter. But again, we didn't have it in our possession until we were able to find out what this letter was that Mr. Berkowitz referenced, until I actually went out to the school and pulled the letter out of the bag along with her—her district-issued items, if that makes sense.

Q. So he—so he never responded to you?

A. He never responded and he never came back to work.

Q. At all?

A. At all. Until he wanted to make arrangements to pick up his items.

Q. Did he formally resign?

A. He ended up—what happened was because of his insubordination, Dr. Wanza, part of our work with administrators, principals and assistant principals, we have the right to nonreappoint. And so a decision was made to nonreappoint him as an assistant principal, which would still give him the right to, you know, become a teacher if he so chose.

Q. Sure.

A. However, um, prior to the board meeting where the nonreappointment was going to occur, um, he decided to submit a letter of resignation to the district.

Q. Okay.

A. So his employment status now is that he's no longer employed and he did resign.

Q. Okay.

A. Back to—

. . . .

A.      Sure. Um, So if we go back to—if we go back to Dr. Cheryl Cendan, again, she was supposed to come in that afternoon on June 7th. But as I said, it obviously went a different direction. With her not coming in, trying to ascertain the information from Mr. Berkowitz, getting a family medical leave, and similar to Mr. Berkowitz, a decision was made by Dr. Wanza to nonreappoint Dr. Cendan as of the end of the month of June. And so that was plan—that plan was to—to bring that forward to the board at that board meeting, which occurred on—on that Tuesday, June, um—let me get the right date. June 26th. However, the day before the board meeting on June 25th, it's my understanding that she submitted a letter of retirement from the district.

Semisch Statement to SIU at 3–5.

We can now say with confidence what we couldn't say when we just had the out-of-context portion Cendan had plucked for us: This story has nothing to do with retaliating against Cendan for taking FMLA leave. To the contrary, the whole story has to do with Semisch's understandable concern that Cendan would leave campus without turning in her school-owned property. And medical leave only came up because, when Semisch heard that Cendan wasn't just leaving *that* day—that she, instead, might be gone (on medical leave) until August—she grew even more concerned that the School Board would *never* get its property back. So, she contacted Cendan's assistant principal (Berkowitz) to make sure that he had gotten Cendan's belongings. But, after initially putting Semisch's mind at ease—by telling her that Cendan had given him a bag filled with the school's property—Berkowitz went (for lack of a better word) AWOL and stopped returning Semisch's calls or texts. Ultimately, as we saw, Semisch made her way to Cendan's office—where Berkowitz had left Cendan's bag—and inventoried the bag's contents, which included Cendan's school-issued laptops, iPad, phone, and keys. It also had a letter from a school administrator (Amy Petros) about two of MCA's booster checks. And the last paragraph—the only one Cendan thought it prudent to quote from—was just a summary of all these things: "[Cendan] not coming in, [me] trying to ascertain the information from Mr. Berkowitz, getting a family medical leave, and similar to Mr. Berkowitz [who was also non-renewed for reasons having *nothing* to do with FMLA leave.]"

Semisch, in sum, was concerned about getting the School Board's property back—especially given Cendan's FMLA request, which indicated that Cendan might be gone for two months (or more). Once she confirmed that she had all of Cendan's school property, though, she and Wanza felt comfortable issuing the Non-Renewal Letter. And they sent the Non-Renewal Letter, as we've seen, *both* because Cendan had retired *and* because Cendan was being investigated on serious charges of financial malfeasance. FMLA leave had nothing to do with it.

***

We therefore **GRANT** the School Board's MSJ (and **DENY as moot** Cendan's MSJ) as to Count III.[12]

### III.    Count IV: Negligent Supervision

In Count IV, Cendan claims that "the School Board, either directly or through its agents and or employees, negligently supervised Wanza, Semisch, Jabouin and School Board members, when the Defendant School Board, knew that a failure to appropriately evaluate, assess and intervene in its interactions with the Plaintiff, and or in conduct regarding the Plaintiff, could result in serious damages." TAC ¶ 78 (errors in original). "Despite this knowledge," Cendan says, "the School Board failed to exercise reasonable care in the supervision of the above-mentioned employees, agents, and representatives," *id.* ¶ 79, and "the breach of the Defendant's duty, owed to the Plaintiff, was the proximate cause of Cendan's loss," *id.* ¶ 81. This claim fails because Cendan cannot show (1) that any School Board employee committed a tort against her, (2) that any such School Board employee was acting outside the scope of his or her employment, *or* (3) that the School Board should've anticipated

---

[12] In her MSJ, Cendan obliquely references a "cat's paw" theory of retaliation. *See* Pl.'s MSJ at 3. But she never mentions this theory in her Response. *See generally* Pl.'s Response; *cf. Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Hamilton*, 680 F.3d at 1319 ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue [forfeits] it."). In any case, "cat's paw" is, for three reasons, inapplicable here. *One*, the Eleventh Circuit has "not yet determined whether plaintiffs may proceed under a 'cat's paw' theory in the FMLA context," *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 831 (11th Cir. 2015), and we decline to extend that doctrine to the facts of our case. *Two*, Cendan never tells us who the "cat" would be in our scenario. That is, she doesn't identify the innocent final decisionmaker whose termination decision was influenced by the nefarious underling. *Cf. Wills*, 2022 WL 845183, at *34 ("Our Circuit has long applied the cat's-paw theory to cases of race- or gender-based discrimination when the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation." (cleaned up)); *ibid.* ("In other words, the court has said that causation may be established if the biased recommender is using the decisionmaker as a mere conduit, or 'cat's paw,' to give effect to the recommender's discriminatory animus." (cleaned up)). *Three*, none of this *really* matters anyway because, as we've established, Cendan *wasn't* terminated—not by an innocent decisionmaker nor by anyone else. All of which is to say that we needn't consider a cat's paw theory here.

(and taken action to prevent) any such tort.

"Under Florida law, to state a claim for negligent supervision, the plaintiff must allege facts sufficient to show that once an employer received actual or constructive notice of problems with an employee's fitness, it was unreasonable for the employer not to investigate and take corrective action." *Inman v. Am. Paramount Fin.*, 517 F. App'x 744, 748 (11th Cir. 2013); *see also Acts Ret.-Life Cmtys. Inc. v. Est. of Zimmer*, 206 So. 3d 112, 114 (Fla. 4th DCA 2016) ("Negligent supervision exists when the defendant negligently placed [the plaintiff] under the supervision of [an employee], when [the defendant] either knew or should have known that [the employee] had the propensity to commit [the torts alleged]." (cleaned up)). For the claim to survive, the employer must have "become[ ] aware or should have become aware of problems with an employee that indicated his unfitness," and then "fail[ed] to take further actions such as investigation, discharge, or reassignment." *Dep't of Env't Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. 5th DCA 2005); *see also Harrison v. Redbull Distib. Co. Inc.*, 2019 WL 1117022, at *2 (M.D. Fla. Mar. 11, 2019) (Steele, J.) ("Liability attaches when an employer (1) knows or should know about the offending employee's unfitness and (2) fails to take appropriate action."). The plaintiff, then, must show *both* that "the employer received actual or constructive notice of problems with an employee's fitness" *and* that "it was unreasonable for the employer not to investigate or take corrective action." *Hardy*, 907 So. 2d at 660. In other words, "there must be a connection and foreseeability between the employee's employment history and the current tort committed by the employee." *Id.* at 661; *see also Malicki v. Doe*, 814 So. 2d 347, 362 (Fla. 2002) (noting that allegations that "the Church Defendants either knew or should have known that Malicki had the propensity to commit sexual assaults and molestations . . . are the classic elements of negligent hiring and negligent supervision claims").

Implicit in all this is a requirement that the employee engage in *some* tortious conduct. *See Footstar Corp. v. Doe*, 932 So. 2d 1272, 1278 (Fla. 2d DCA 2006) (requiring the plaintiff to show that

the employee engaged in "a tort which is recognized under common law"); *Gutman v. Quest Diagnostics Clinical Labs., Inc.*, 707 F. Supp. 2d 1327, 1331–32 (S.D. Fla. 2010) (Ungaro, J.) ("Defendants are correct that the underlying wrong for either claim [negligent supervision or negligent training] must be a common law tort."). One final thing: The underlying tortious conduct must have "occurred outside the scope of the employee's employment." *Harrison*, 2019 WL 1117022, at *2; *see also Johnson v. Scott*, 2013 WL 5928931, at *5 (M.D. Fla. Nov. 1, 2013) (Polster Chappell, J.) ("A negligent hiring, retention, or supervision claim is allowed against an employer for acts of an employee committed outside the scope and course of employment."); *Acts Ret.-Life*, 206 So. 3d at 115 ("Furthermore, it is also necessary that the actions of the employee be performed *outside* the scope of employment.").

Cendan fails all three elements: She's hasn't shown that any School Board employee engaged in tortious conduct against her; she cannot establish that any such tortious conduct (even if committed) occurred *outside* the scope of the employee's employment; and she has produced no evidence for her view that the School Board had actual or constructive knowledge that any such torts would be committed. We address each in turn.

### A.  Common Law Torts

As we've said, Cendan has failed to show that any School Board employee committed a common law tort against her. In her Response to the School Board's MSJ, Cendan identifies two torts that (she says) support her negligent-supervision claim[13]: (1) that "Wanza did not confirm the accuracy, or authenticity of certain newspaper articles, which were sent to Educational Practices Commission

---

[13] In her TAC, Cendan identified seven *other* underlying torts, *see* TAC ¶¶ 70–76—all of which she appears to have abandoned here, *see generally* Pl.'s Response. She, after all, never reasserts them in her MSJ Response and offers no evidence for any of them. "A plaintiff's reliance upon unsubstantiated allegations in a complaint is not enough to survive summary judgment." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *see also Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990) ("A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings.").

of the Florida Department of Education, about Cendan, under Wanza's signature for final approval," Pl.'s Response at 10; and (2) that "Christine Semisch admitted that the School Board's referral of the disciplinary allegations against Cendan to the FDOE, in June of 2018, contained an allegation that *criminal offenses*, against the Plaintiff, were 'pending' but according to Semisch, this statement on the status of a criminal investigation, was a 'scrivener's error," *ibid.*

But Cendan never mentioned either of these as "torts" in her complaint. *See generally* TAC. And it's well-settled that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 779 (11th Cir. 2014); *see also, e.g.*, *Walker v. United Parcel Serv., Inc.*, 2021 WL 1089872, at *20 (S.D. Fla. Mar. 22, 2021) (Altman, J.) ("[T]he racial animus allegation appears nowhere in the Amended Complaint—which is reason enough to ignore it. . . . A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (cleaned up)); *Moulton v. Prosper*, 2019 WL 4345674, at *10 (S.D. Fla. Sept. 12, 2019) (Altman, J.) ("It is well-established in this Circuit that a plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (cleaned up)). This principle applies even when the plaintiff's new allegations are merely "'additional evidence' rather than 'additional claims.'" *Mitchell v. Pilgrim's Pride Corp.*, 817 F. App'x 701, 708 (11th Cir. 2020). We thus refuse to consider a negligent-supervision claim that's premised on two (alleged) torts Cendan never bothered to mention in her complaint. And, without these two torts (of course), Cendan's negligent-supervision claim fails.

In either event, these alleged torts—Wanza's transmittal of a few newspaper clippings and Semisch's misstatement to the FDOE—cannot rescue Cendan's claim. Although she doesn't say so explicitly, we assume that Cendan classifies these two wrongs (the one from Wanza, the other by Semisch) as common law acts of defamation. After all, each of the two involves the (purported) publication of statements Cendan sees as false and personally harmful. *See, e.g.*, Pl.'s Response at 10 (referring to these as "false and defamatory claims against the professional reputation of the Plaintiff").

37

Under Florida law, "[d]efamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

Cendan's two *new* torts plainly fail the first element—publication. "The publication prong is not met as a matter of law where the communications are between governmental employees and agencies." *Diaz v. Miami-Dade Cnty.*, 424 F. Supp. 3d 1345, 1364 (S.D. Fla. 2019) (Moreno, J.), *aff'd*, 849 F. App'x 787 (11th Cir. 2021); *see also Alvarez v. Ridge*, 2004 WL 7331011, at *4 (S.D. Fla. Mar. 31, 2004) (Martinez, J.) ("In the defamation context, reports to the government, particularly within the same department, are not public."); *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984) ("A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation."). Again, Cendan is complaining about (alleged) misstatements in Wanza and Semisch's reports to the FDOE—a state governmental agency that, like Wanza and Semisch, is charged with ensuring that the employees of Broward County's schools conduct themselves ethically and professionally. *See* FLA. STAT. § 1001.10(4)(a) (2022) ("The Department of Education shall: Provide technical assistance to school districts [and] charter schools . . . in the development of policies, procedures, and training related to employment practices and standards of ethical conduct for instructional personnel and school administrators, as defined in s. 1012.01."). Cendan has thus failed to show that either of the challenged actions—Wanza's transmittal

of newspaper clippings or Semisch's checked box—can support a proper defamation claim under Florida law.[14]

Note, too, that Cendan has failed to satisfy the second element of a defamation claim (falsity) with respect to Wanza's newspaper articles. Florida law is clear that "the alleged defamatory statement . . . . must actually be false." *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021) (cleaned up). Although Cendan has attached the newspaper clippings—buried deep within a 44-page exhibit, *see* Investigation Packet [ECF No. 109-1]—she (amazingly) never says that anything in those articles was false. She simply complains that "Wanza did not confirm the accuracy" of those articles. Pl.'s Response at 10. Since Cendan has produced no evidence that the articles were false, Wanza cannot have defamed her by including those articles in her report to the FDOE.

## B. Scope of Employment

As we've suggested, Cendan also fails the second element of a negligent-supervision claim, because she cannot show that any purported tort "occurred *outside* the scope of the employee's employment." *Harrison*, 2019 WL 1117022, at *2 (emphasis added). She, in fact, concedes that "[t]hese egregious acts and omissions were indeed *within* the scope of the authority of these School Board Employees," and that "those employees, agents and representatives were acting *within* the scope of

---

[14] In her MSJ Cendan adds one more tort that (she believes) supports her negligent-supervision claim: Wanza's (allegedly) defamatory statements at the June 7 faculty meeting. *See* Pl.'s MSJ at 7–8. But, as we explained at the hearing on Wanza's Motion to Dismiss ("Wanza's MTD") [ECF No. 52], none of Wanza's challenged statements at that meeting were *actually* false or defamatory, *see* Minute Entry: Apr. 20, 2021 H'rg on Wanza's MTD [ECF No. 67]. Notably, in our subsequent order, we granted Wanza's MTD *without* prejudice and *with* leave to amend. *See* Order Granting Wanza's MTD ("MTD Order") [ECF No. 70]. Rather than reallege her defamation claim against Wanza, though, Cendan abandoned it in a submission she labeled "Plaintiff's Notice of Non-Filing of Amendment to Count V (Defamation)" [ECF No. 74]. What's worse, despite months of discovery, Cendan has *still* given us no evidence for her (now-forfeited) view that any of Wanza's statements at that meeting were, in fact, false or defamatory. Those statements thus cannot support her negligent-supervision count—even if she had advanced them in opposition to the School Board's MSJ (which, again, she did not).

their authority." Pl.'s Response at 10.[15] That's really the end of that—because we don't hold employers liable for the tort of negligent supervision when their employees do the things they were hired to do. *See, e.g.*, *Acts Ret.-Life*, 206 So. 3d at 117 ("Transporting Zimmer to whatever destination he wished was the very thing the ACTS drivers were hired to do. Guarding the gate and allowing visitors through was the very thing the gate guards were hired to do. Negligent supervision is simply not the appropriate claim to bring against an employer whose employees are acting within the scope of their duties."); *Total Rehab. & Med. Centers, Inc. v. E.B.O.*, 915 So. 2d 694, 697 (Fla. 3d DCA 2005) ("Otherwise, an employer would be an absolute guarantor and strictly liable for any acts committed by his employee against any person under any circumstances. Such [condition] would be an intolerable and unfair burden upon employers." (quoting *Garcia v. Duffy*, 492 So. 2d 435, 439 (Fla. 2d DCA 1986))).

### C. Actual or Constructive Knowledge

Finally, Cendan's negligent-supervision claim fails because she cannot show that "the employer received actual or constructive notice of problems with an employee's fitness." *Hardy*, 907 So. 2d at 660. In its MSJ, the School Board specifically argued that "there is no evidence in the record to show that the School Board was put on notice that Semisch, Jabouin and Lev[e]nson had a propensity to engage in the complained of actions, and that the School Board failed to address the same," and they contended that "there is no evidence in the record that the School Board was put on notice that Wanza had a propensity to defame." Def.'s MSJ at 16. For reasons that aren't entirely clear, Cendan never responds to this argument at all. *See generally* Pl.'s Response. She never, in other words, suggests that Wanza, Semisch, or any other employee committed any similar tort or misconduct in the past; she never claims that the School Board had any knowledge of any past misbehavior; and she

---

[15] And, for what it's worth, the record contains no *other* evidence that these employees (Wanza and Semisch) were acting *outside* the scope of their employment when they made the statements Cendan is challenging here.

certainly never points to any evidence for either of these propositions. *See generally ibid.* As one court has written on this precise issue: "[I]t is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with the actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985). Yet again, then, Cendan has forfeited this dispositive issue. *Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Hamilton*, 680 F.3d at 1319 ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited]."); *Legg v. Voice Media Grp., Inc.*, 2014 WL 1767097, at *6 n.5 (S.D. Fla. May 2, 2014) (Cohn, J.) (noting that a party's "failure to respond to [an] argument provides an independently sufficient ground to grant [that] aspect of the Motion by default").

\*\*\*

Since Cendan has failed to produce *any* evidence for *any* of the three elements of her negligent-supervision claim, we **GRANT** the School Board's MSJ (and **DENY as moot** Cendan's MSJ) as to Count IV.

## CONCLUSION

After careful review, and for all the reasons we've outlined here, we hereby **ORDER AND ADJUDGE** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 96] is **GRANTED**.

2. The Plaintiff's Motion for Partial Summary Judgment [ECF No. 108] is **DENIED as moot**.

3. Pursuant to FED. R. CIV. P. 58, we'll enter final judgment separately.

4. The Clerk of Court shall **CLOSE** this case.

5.  All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELLED**.

**DONE AND ORDERED** in the Southern District of Florida, this 9th day of September 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record